UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| DARRELL D., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case # 1:20-cv-1536-DB |
| | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | MEMORANDUM DECISION |
| | § | AND ORDER |
| Defendant. | § | |

## INTRODUCTION

Plaintiff Darrell D. ("Plaintiff") brings this action pursuant to the Social Security Act (the "Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner"), that denied his application for Disability Insurance Benefits ("DIB") under Title II of the Act, and his application for supplemental security income ("SSI") under Title XVI of the Act. *See* ECF No. 1. The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c), and the parties consented to proceed before the undersigned in accordance with a standing order (*see* ECF No. 12).

Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See* ECF Nos. 9, 10. Plaintiff also filed a reply brief. *See* ECF No. 11. For the reasons set forth below, Plaintiff's motion for judgment on the pleadings (ECF No. 9) is **DENIED**, and the Commissioner's motion for judgment on the pleadings (ECF No. 10) is **GRANTED**.

## BACKGROUND

Plaintiff protectively filed his DIB application on April 4, 2014, and his SSI application on April 9, 2014. Transcript ("Tr.") 345-51. In both applications, Plaintiff alleged disability beginning May 1, 2010 (the disability onset date). *Id*. The claims were denied initially on February 13, 2013, after which Plaintiff requested an administrative hearing. Tr. Tr. 232-39, 242. On December 13,

2016, Administrative Law Judge Bryce Baird (the "ALJ") conducted a hearing in Buffalo, New York. Tr. 207. Plaintiff appeared and testified at the hearing and was represented by Phillip V. Urban ("Mr. Urban"), an attorney. *Id*. Roxanne Benoit, an impartial vocational expert ("VE"), also appeared and testified at the hearing. *Id*. Plaintiff's girlfriend, Morgan Greene, also appeared and testified at the hearing. *Id*. At this hearing, Plaintiff amended his alleged disability onset date to August 26, 2013. Tr. 97.

The ALJ issued an unfavorable decision on June 26, 2017. Tr. 204-226. On October 15, 2018, the Appeals Council remanded the case because the ALJ's June 2017 decision considered Plaintiff's application for DIB but did not consider his claim for SSI. Tr. 229. The ALJ was instructed on remand to adjudicate both claims for DIB and SSI. Tr. 229-30. Thereafter, on May 7, 2019, the ALJ held another hearing in Buffalo, New York, at which Plaintiff appeared and testified, and was represented by Mr. Urban. Tr. 19, 43-92. Mary Everts, an impartial VE, also testified at the hearing. Tr. 19.

The ALJ issued a partially favorable decision on June 24, 2019. Tr. 17-36. On August 26, 2020, the Appeals Council denied Plaintiff's request for further review. Tr. 1-6. The ALJ's June 24, 2019 decision thus became the "final decision" of the Commissioner subject to judicial review under 42 U.S.C. § 405(g).

## LEGAL STANDARD

### I.   District Court Review

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing 42 U.S.C. § 405(g)) (other citation omitted). The Act holds that the Commissioner's decision is "conclusive"

if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citations omitted). It is not the Court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F. 3d 496, 501 (2d Cir. 1990).

## II.    The Sequential Evaluation Process

An ALJ must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. *See Parker v. City of New York*, 476 U.S. 467, 470-71 (1986). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful work activity. *See* 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities. *Id*. § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments meeting the durational requirements, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). *Id*. § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement, the claimant is disabled. *Id*. § 404.1509. If not, the ALJ determines the claimant's residual functional capacity, which is the ability to perform physical or mental work activities on a sustained basis notwithstanding limitations for the collective impairments. *See id*. § 404.1520(e)-(f).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. *Id*. If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. *Id*. § 404.1520(g). To do so, the Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of his or her age, education, and work experience. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 404.1560(c).

## ADMINISTRATIVE LAW JUDGE'S FINDINGS

The ALJ analyzed Plaintiff's claim for benefits under the process described above and made the following findings in his June 24, 2019 decision:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2. The claimant has not engaged in substantial gainful activity since the amended alleged onset date of August 26, 2013 (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. Since the alleged onset date of disability, August 26, 2013, the claimant has had the following severe impairments: degenerative disease of the lumbar spine; degenerative disease of the left shoulder; degenerative joint disease of the right knee; obesity; history of umbilical hernia with surgical repair; thrombophlebitis with clotting disorder; depression and anxiety disorders (20 CFR 404.1520(c) and 416.920(c)).

4. Since August 26, 2013, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. Since the amended alleged disability onset date of August 26, 2013, the claimant has had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b),[1]

---

[1] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg

because he is able to lift, carry, push, and/or pull twenty pounds occasionally and ten pounds frequently, stand or walk for up to six hours in an eight-hour workday, and sit for up to six hours in an eight-hour workday. The claimant must be able to sit for ten minutes after thirty minutes of standing or walking, and he must be able to stand, walk, or stretch for up to one minute after thirty minutes of sitting (he will be off task for the one minute of standing, walking, or stretching). Although the claimant is unable to crawl or climb ladders, ropes, or scaffolds, he is able to occasionally balance, stoop, kneel, and crouch as well as frequently climb ramps or stairs. The claimant is able to use his left upper extremity to frequently reach in all directions, but he is unable to tolerate exposure to excessive vibrations and workplace hazards such as unprotected heights and moving machinery. In addition, the claimant is able to engage in work limited to simple, routine tasks (that can be learned after a short demonstration or within thirty days), and he is able to engage in work with no production-rate or pace work. The claimant is able to engage in work that allows a person to be off-task for 5% of an eight-hour workday, in addition to regularly scheduled breaks. The claimant is able to engage in no more than superficial interaction with the public as well as occasional interaction with co-workers, and he is able to engage in work that does not require teamwork (such as on a production line).

6.  Since August 26, 2013, the claimant has been unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  On the amended alleged disability onset date of August 26, 2013, the claimant was an individual closely approaching advanced age; later, on August 25, 2018, the claimant's age category changed to an individual of advanced age (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Prior to August 25, 2018, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. Beginning on August 25, 2018, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant could perform (20 CFR 416.960(c) and 416.966).

---

controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities. If someone can do light work, [the SSA] determine[s] that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

12. The claimant was not disabled prior to August 25, 2018 but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 19-35.

Accordingly, the ALJ determined that, based on the application for a period of disability and disability insurance benefits protectively filed on April 4, 2014, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act. Tr. 35.

The ALJ also determined that based on the application for supplemental security income benefits protectively filed on April 9, 2014, the claimant has been disabled under section 1614(a)(3)(A) of the Act beginning on August 25, 2018. Tr. 36.

## ANALYSIS

Plaintiff asserts three points of error. Plaintiff first argues that the ALJ failed to properly apply the treating physician rule to the opinion of orthopedist Lindsey Clark, M.D. ("Dr. Clark"). *See* ECF No. 9-1 at 15-19. Next, Plaintiff argues that the ALJ failed to reconcile the RFC with the opinion of consultative examiner with Janine Ippolito, Psy.D. ("Dr. Ippolito"), and failed to make findings regarding Plaintiff's stress limitations. *See id*. at 19-23. Finally, Plaintiff argues that the ALJ improperly assessed a highly specific RFC that was based on his own lay opinion, rather than substantial evidence. *See id*. at 23-30.

In response, the Commissioner argues that: (1) the ALJ properly considered the regulatory factors and gave good reasons for assigning Dr. Clark's opinion little weight; (2) the ALJ's RFC finding properly accounted for Dr. Ippolito's opinion regarding Plaintiff's difficulties dealing with stress; and (3) the ALJ did not impermissibly rely on his own lay opinion in assessing Plaintiff's RFC. *See* ECF No. 10-1 at 9-24.

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw v.*

*Chater*, 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa*, 168 F.3d at 77.

Upon review of the record in this case, the Court finds that substantial evidence in the record supports the ALJ's finding that Plaintiff retained the RFC to perform a reduced range of unskilled light work prior to August 25, 2018, the date his age category changed,. First, the ALJ properly weighed Dr. Clark's treating source opinion in accordance with the regulations and gave good reasons for assigning the opinion little weight, including that Dr. Clark's opinion was unsupported by her own clinical findings and inconsistent with other evidence in the record. The ALJ also properly accounted for Dr. Ippolito's opinion of difficulties dealing with stress in the RFC finding. Finally, contrary to Plaintiff's argument, the ALJ's RFC finding is not required to directly mirror a medical opinion, and the ALJ did not impermissibly rely on his own lay opinion in assessing Plaintiff's RFC.

On June 25, 2013, Plaintiff presented to Sarah Thompson, M.D. ("Dr. Thompson"), at UBMD Internal Medicine, for a follow-up visit. Tr. 513-517. He reported his anxiety was "problematic," and his pain was not well controlled at times; he thought he "need[ed] a change in his regimen." Tr. 513. He also reported swelling in his feet after 2-3 hours of standing and pain in the left chest wall, although he was not aware of any trauma to the chest area. *Id*.  Plaintiff was a cigarette smoker. Tr. 515. Plaintiff's physical and mental examination were unremarkable. Tr. 515-16. Dr. Thompson ordered a rib x-ray; Plaintiff's pain medication was switched to Oxycontin and Lortab; his current Coumadin dosing was continued; and Trilipix, Furosemide, Potassium, and Buspar were prescribed. Tr. 516-17.

On February 5, 2014, Plaintiff had a follow-up visit with Dr. Thompson. Tr. 500-05. He reported a weight gain of 50 pounds related to venlafaxine and complained of poor sex drive, urinary urgency, and bloating/upper abdominal pain. Tr. 500. Plaintiff was still smoking and not ready to quit. *Id*. Dr. Thompson was suspicions of possible onset of diabetes mellitus due to Plaintiff's weight gain and urinary issues and ordered additional testing. Tr. 504. She also noted that Plaintiff had not been compliant with prescribed medication for his urinary issues and stated she would refer for a urology consult if problems persisted. *Id*.

On May 9, 2014, Plaintiff had a follow-up visit with Dr. Thompson. Tr. 555-60. He complained of left shoulder pain and limited range of motion ("ROM") following a motor vehicle accident a few days prior. Tr. 560. He reported that his sex drive and energy were improved since starting testosterone therapy, and his weight stabilized after being taken off Effexor. *Id*.  His mood was labile, and he thought he needed something to help with depression. *Id*. He also continued to complain of bloating/upper abdominal pain and urinary urgency. *Id*. The treatment note indicates that Plaintiff was previously "recommended to see urology but did not do so."  Tr. 558. Plaintiff was again referred for a urology consult, as well as an orthopedics consult. Tr. 559.  A colonoscopy and upper scope were ordered; Lisinopril and Lexapro were prescribed; and ultrasound and mammogram of right breast tissue were ordered. Tr. 550-60.

On July 17, 2014, Plaintiff underwent a psychiatric consultative examination with Dr. Ippolito. Tr. 606-11. Plaintiff stated that he was able to do cooking, cleaning, laundering, grocery shopping, showering, and dressing independently. Tr. 609. He also reported being able to manage his own money with some assistance from his mother, and he was able to drive. *Id*. On mental status examination, his affect was anxious; mood was somewhat dysthymic; attention and concentration were impaired due to difficulty with math problems; recent and remote memory

skills were impaired due to some distractibility; and insight and judgment were fair. Tr. 608-09.

Dr. Ippolito opined that Plaintiff could appropriately deal with stress with moderate limitations.

Tr. 610. These limitations were due to Plaintiff's current emotional distress and fatigue, and Dr.

Ippolito opined that these results appeared consistent with psychiatric problems which were not

severe enough to interfere with his ability to function on a daily basis. *Id*. Dr. Ippolito diagnosed

Plaintiff with major depressive disorder, recurrent and moderate, and unspecified anxiety disorder

with panic attacks. *Id*.

On July 17, 2014, Plaintiff underwent an orthopedic consultative examination with

Hongbiao Liu, M.D. ("Dr. Liu"). Tr. 612-19. Plaintiff reported his history of clotting problems,

along with left shoulder and low back pain. Tr. 613. He also reported he had a transient ischemic

attack in 2010, from which he completely recovered and had no current complaints. *Id*. Plaintiff

reported he could do cooking four to five times a week; clean house, do laundry, and shop once a

week; and he liked to watch TV and listen to the radio. Tr. 614. He takes a shower three to four

times a week and dresses every day. *Id*.

On physical examination, Plaintiff could walk on his heels and toes with mild difficulty

because of lower back pain; squat 90% because of low back pain; and had full ROM in the

shoulders and thoracic and lumbar spine. Tr. 614-15. Otherwise, Dr. Liu noted that Plaintiff

exhibited few deficits: his gait was normal; strength/sensation in the limbs was normal; and there

was no evidence of grip/dexterity loss. *Id*. Dr. Liu diagnosed Plaintiff with history of transient

ischemic attack; chronic neck, low back, and shoulder pain; history of pulmonary embolism;

status-post filter placement; anxiety and depression; hypertension; history of skin cancer; and

hypothyroidism; and opined that Plaintiff had mild limitation for prolonged walking, bending,

kneeling, and overhead reaching. Tr. 616. An x-ray of the left shoulder was negative, and an x-ray of the lumbosacral spine showed disc space narrowing. Tr. 618-19.

On August 7, 2014, state agency psychological consultant C. Butensky ("Dr. Butensky") reviewed Plaintiff's record at the time, including Dr. Ippolito's report, and opined that Plaintiff had mild restriction of activities of daily living; difficulties maintaining, social functioning and concentration, persistence, or pace; and no repeated episodes of decompensation, and Plaintiff's mental health impairments were non-severe. Tr. 197-98.

On September 24, 2014, Plaintiff treated at UBMD Physicians Group at Amherst – Primary Care for anxiety follow up. Tr. 1010-1015. He also complained of urinary issues, continued left shoulder pain, and right breast pain. Tr. 1010. He reported feeling better on a higher dose of Lexapro, and his medications were continued. *Id.*

On October 30, 2014, Plaintiff treated with Geoffrey A. Bernas, M.D. ("Dr. Bernas"), at UBMD Orthopaedics & Sports Medicine, for left shoulder pain. Tr. 653-55. On physical examination, Plaintiff had moderate tenderness over the left lateral aspect; limited ROM; mildly positive cross arm test; mildly positive Hawkins impingement sign; and near impingement test O'Brien's test was negative bilaterally. Tr. 654. The exam noted mild improvement of pain and weakness of scapular retraction and assisted test. *Id.* Dr. Bernas ordered a magnetic resonance ("MR") arthrogram of the left shoulder. *Id.* The MR arthrogram performed on November 10, 2014 showed moderate grade partial-thickness tear involving the supraspinatus tendon involving approximately 50% of the thickness of the tendon over most of the tear and approximately 75% of the thickness of the tendon along the anterior 7mm. Tr. 656-57.

On December 23, 2014, Plaintiff presented as a new patient to UBMD Internal Medicine for a psychiatric consult with Sourav Sengupta, M.D. ("Dr. Sengupta"). Tr. 724-28.  His chief

complaints were anxiety and depression. Tr. 724. Plaintiff was struggling with depressive and panic symptoms and reported a long history of psychiatric illness since experiencing episodes of DVT (deep vein thrombosis) and PE (pulmonary embolism) related to a blood dyscrasia about 15 years ago. Tr. 724. On mental examination, Plaintiff was alert and oriented with intact judgment and insight, intact recent and remote memory and normal thought processes; however, his mood and affect were anxious and restricted. Tr. 727. Escitalopram was continued at the current dose, and Bupropion was prescribed. Tr. 728. Dr. Sengupta assessed major depression and panic disorder but also noted that Plaintiff's "racing thoughts appear[ed] more anxiety related and increased activity [was] related more so to euthymic periods." *Id*. Dr. Sengupta also stated that it was "imperative that [Plaintiff] engage actively in therapy to develop the behavioral, psychosocial skills to counteract his panic and depressive symptoms." *Id*.

On March 25, 2015, Plaintiff presented for a follow-up visit with Dr. Thompson at UBMD Physicians Group at Amherst – Primary Care. Tr. 1003-09. Plaintiff reported severe paraspinal pain exacerbated by lifting, coughing, and bending forward. Tr. 1003. He was interested in surgical options for his chronic pain issues, as "he would love to be able to return to work" and "enjoyed working as a maintenance man." *Id*. Plaintiff had tenderness of the right sacroiliac ("SI") joint, but his musculoskeletal examination was otherwise unremarkable Tr. 1007. Cyclobenzaprine was restarted, Bupropion was increased, and he was referred to rehab medicine. Tr. 1009.

On May 12, 2015, Plaintiff was seen by Meghan McNichol, PA-C "Ms. McNichol"), at UBMD Orthopaedics & Sports Medicine,[2] upon referral from Dr. Thompson.  Tr. 635-39. Plaintiff reported low back pain beginning in 2000 after a motor vehicle accident and worsening over the

---

[2] The record appears to indicate that Ms. McNichol, Dr. Clark, and Dr. Bernas are all affiliated with the same practice. *See* Tr. 634. In some records, the practice is referred to as UBMD Orthopaedics & Sports Medicine. *See, e.g.*, 635,653. In most other records, however, the practice is referred to as University Orthopaedic Services. *See, e.g.*, Tr. 638-40, 643, 648, 652, 658, 676, 733.

past several years with intermittent right leg pain traveling the posterior thigh and stopping midcalf. Tr. 635. On examination, Plaintiff had right SI joint tenderness, but his musculoskeletal examination was otherwise normal Tr. 636. X-rays of the lumbar spine showed degenerative changes at L5-S1, and Ms. McNichol recommended chiropractic management over the next several weeks. Tr. 637.

On May 20, 2015, Plaintiff treated with therapist Kathleen Shannon, LCSW-R ("Ms. Shannon"), at General Physicians, PC, complaining of "low energy, negative thinking, and procrastination." Tr. 629-30. Plaintiff reported improvement in panic attacks, and he was taking Lexapro and Wellbutrin as prescribed. Tr. 629. His mental status examination was mostly normal. Tr. 629. Ms. Shannon assessed agoraphobia with panic disorder and depressive disorder major recurrent moderate. *Id*. He was to return in two weeks. *Id*.

On June 9, 2015, Plaintiff had a follow-up visit with Dr. Thompson at UBMD Physicians Group at Amherst – Primary Care. Tr. 999-1002. Plaintiff reported he was "unable to walk/stand/sit/push/pull/bend/lift/carry for all but brief periods of time," and he had "limited ability to focus due to agoraphobia, panic disorder, depression;" he presented disability forms for completion. Tr. 999. Plaintiff stated he did not see how it was feasible to return to work as a maintenance worker with his limitations. *Id*. Plaintiff was still noted to be an "every day smoker." Tr. 1001. Dr. Thompson completed Plaintiff's "disability forms in accordance with [his] limitations," and Hydrocodone-Acetaminophen was restarted. Tr. 1002.

On June 26, 2015, Plaintiff treated with Dr. Clark at University Orthopaedic Services for low back and right leg pain. Tr. 640-42. He had attended only one chiropractic adjustment and could not return due to monetary reasons. Tr. 640. On physical examination, he had tenderness to palpation about the paraspinal musculature of the lumbar spine and about the SI joints bilaterally;

he had decreased ROM in all planes with irritation; and he was encouraged to see a chiropractor on a regular basis. Tr. 641.

On July 21, 2015, Plaintiff treated with therapist Ms. Shannon for depressive disorder major recurrent moderate and agoraphobia with panic disorder continued symptoms. Tr. 627-28. He reported having good days and bad days. Tr. 627. Mental status examination results were normal, including no psychomotor agitation; coherent, linear, and goal-directed thought processes; and good insight and judgment. *Id*.

On August 17, 2015, Plaintiff treated with Dr. Clark for low back and right leg pain. Tr. 643-45. He had been working with a chiropractor without much improvement in his symptoms; Flexeril was helping somewhat; he had bilateral leg pain, numbness, and tingling, left worse than right; and a lumbar MRI was ordered. *Id*

On August 3 and 25, and September 16, 2015, Plaintiff treated with Ms. Shannon for depressive disorder major recurrent moderate and agoraphobia with panic disorder with improved but continued symptoms. Tr. 623-26, 631-32.

On September 14, 2015, an MRI of the lumbar spine showed L1-L2 and L2-L3 diffuse broad-based disc bulge causing effacement of the anterior thecal sac; L3-4 mid to right paracentral disc herniation, diffuse broad-based disc bulge causing effacement of the anterior thecal sac, and mild bilateral neural foraminal narrowing; L4-5 shallow right paracentral disc herniation, diffuse broad-based disc bulge, and mild to moderate bilateral neural foraminal narrowing; and L5-S1 diffuse broad-based disc bulge, and moderate to marked bilateral neural foraminal narrowing. Tr. 646-47.

On September 25, 2015, Plaintiff treated with Dr. Clark for low back and right leg pain. Tr. 648-50. He had the same physical findings and tenderness to palpation over the sciatic notch, and a right-sided L5-S1 epidural steroid injection was recommended. *Id.*

On December 2, 2015, Plaintiff treated at Buffalo General Hospital for syncope. Tr. 663-73. Thereafter, on December 7, 2015, he treated at UBMD Physicians Group at Amherst – Primary Care for follow up after his hospital visit, and his syncope was attributed to a vasovagal episode. Tr. 968-72.

On December 14, 2015, Plaintiff treated with Dr. Clark for low back and right leg pain; he was unable to go off Coumadin and therefore unable to undergo an epidural steroid injection, and an EMG was ordered. Tr. 676-78.

On December 19, 2015, Ms. Shannon completed a mental residual functional capacity assessment regarding Plaintiff's diagnoses of panic disorder with agoraphobia and depression. Tr. 729-32. Ms. Shannon reported that she had treated Plaintiff weekly since November 10, 2014, and his prognosis was "guarded." Tr. 729. Ms. Shannon assessed that Plaintiff had "marked" limitations with many basic mental work tasks, including the ability to remember locations and work-like procedures; understand and remember very short and simple instructions; understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of and length of rest periods, interact appropriately with the general public, ask simple questions or request assistance, respond appropriately to changes in the work setting, set realistic goals or make plans independently of

others, and tolerate normal levels of stress. Tr. 730-32. She assessed  moderate limitations in the ability to carry out very short and simple instructions; sustain an ordinary routine without special supervision,; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; be aware of normal hazards and take appropriate precautions; and travel in unfamiliar places or use public transportation. *See id.* Finally, Ms. Shannon assessed mild limitations in the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. *See id.*

Ms. Shannon also assessed that Plaintiff's impairments would substantially interfere with his ability to work on a regular and sustained basis at least 20% of the time; he would need to miss work 10 days per month because of his mental impairment or for treatment of the mental impairment; he could not work on a regular and sustained basis in light of his mental impairment because he struggled with depression, panic symptoms, mood dysregulation, poor concentration, and difficulty staying on task, and when he was depressed, he isolated at home and had difficulty with routine activities; and he could manage his own funds because he was of normal intelligence and used automated payment for his bills. Tr. 730-32

On January 20, 2016, Plaintiff treated with Dr. Clark for low back and right leg pain. Tr. 733-36. EMG showed right L4 and L5 radiculopathy; he had not gotten relief with chiropractic management; and he could not undergo an epidural steroid injection due to anti-coagulation. *Id.* Lumbar decompression and fusion were discussed, and Plaintiff stated he would discuss it with his family. *Id.*

On March 29, 2016, Dr. Clark completed a lumbar spine medical source statement. Tr. 706-09. She reported that she had treated Plaintiff monthly since May 12, 2015,[3] for radiculopathy and intervertebral disc displacement. *See id*. She reported that his prognosis was good; his impairments were confirmed by MRI and EMG studies; and his impairments were expected to last or had lasted at least twelve months. Tr. 706-707. Dr. Clark also reported that Plaintiff experienced low back pain and right leg pain; he had neuro-anatomic distribution of pain; and positive objective findings included reduced lumbar ROM in all planes and tenderness. *See id*.

Dr. Clark opined that Plaintiff's emotional factors did not contribute to the severity of his symptoms and functional limitations; he could walk zero city blocks without rest or severe pain; he could sit 10 minutes at one time and stand 10 minutes at one time; he could sit and stand/walk less than two hours each total in an 8-hour day; he needed a job that permitted shifting positions at will from sitting, standing, or walking; he needed to include periods of walking around during an 8-hour day, every 10 minutes for 10 minutes; he would need unscheduled breaks every hour for 15 minutes; he could rarely lift and carry less than 10 pounds and never 10 or more pounds; he could never twist, stoop, crouch/squat, climb ladders, or climb stairs; his symptoms were likely to be severe enough to interfere with the attention and concentration needed to perform even simple work tasks 25% or more of the day; and he was likely to have good and bad days. Tr. 707-09.

On August 23, 2018, Plaintiff treated with Carrie McPherson, PA ("Ms. McPherson"), at UBMD Physicians Group at Amherst – Primary Care, for follow up related to his ongoing back pain. Tr. 900. The treatment record indicates that Plaintiff was taking Oxycodone for his back pain, and he was asked to come in for a urine test. *Id*.

---

[3] On May 12, 2015, Plaintiff was actually seen by Ms. McNichol, which appears to be Plaintiff's initial visit with the practice. Tr. 635-40. As noted above, Ms. McNichol and Dr. Clark are affiliated with the same orthopedics practice.

On November 28, 2018, Plaintiff treated with Kenyani Davis, M.D. ("Dr. Davis"), at UBMD Physicians Group at Amherst – Primary Care, for "back pain for the past several years." Tr. 894-99. He reported that "he was once on disability for his back," then went back to work, but was unable to keep the job due to "his back pain and lower extremity edema causing cellulitis." Tr. 894.  He was being treated with opioids for pain management. *Id*. He was referred for a functional capacity evaluation. Tr. 899.

On February 25, 2019, Plaintiff treated at Community Health Center of Cheektowaga to establish primary care and for medication refills. Tr. 1127-30. On April 25, 2019, Plaintiff treated at Community Health Center of Cheektowaga for follow up of "chronic pain which caused him to not be able to work due to his physical limitations" and "chronic conditions which complicated his healthcare and made it difficult for him to sit or stand for prolonged periods." Tr. 1124. His current medications were continued.  *Id*.

As noted above, Plaintiff challenges the ALJ's RFC analysis and the ALJ's overall conclusion that Plaintiff was not disabled. A claimant's RFC is the most he can still do despite his limitations and is assessed based on an evaluation of all relevant evidence in the record. *See* 20 C.F.R. §§ 404.1520(e), 404.945(a)(1), (a)(3); SSR 96-8p, 61 Fed. Reg. 34,474-01 (July 2, 1996). At the hearing level, the ALJ has the responsibility of assessing the claimant's RFC. *See* 20 C.F.R. § 404.1546(c); SSR 96-5p, 61 Fed. Reg. 34,471-01 (July 2, 1996); *see also* 20 C.F.R. § 404.1527(d)(2) (stating the assessment of a claimant's RFC is reserved for the Commissioner). Determining a claimant's RFC is an issue reserved to the Commissioner, not a medical professional. *See* 20 C.F.R. § 416.927(d)(2) (indicating that "the final responsibility for deciding these issues [including RFC] is reserved to the Commissioner"); *Breinin v. Colvin*, No. 5:14-CV-01166(LEK TWD), 2015 WL 7749318, at *3 (N.D.N.Y. Oct. 15, 2015), *report and*

*recommendation adopted*, 2015 WL 7738047 (N.D.N.Y. Dec. 1, 2015) ("It is the ALJ's job to determine a claimant's RFC, and not to simply agree with a physician's opinion.").

Additionally, it is within the ALJ's discretion to resolve genuine conflicts in the evidence. *See Veino v Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). In so doing, the ALJ may "choose between properly submitted medical opinions." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998). Moreover, an ALJ is free to reject portions of medical-opinion evidence not supported by objective evidence of record, while accepting those portions supported by the record. *See Veino*, 312 F.3d at 588. Indeed, an ALJ may formulate an RFC absent any medical opinions. "Where, [] the record contains sufficient evidence from which an ALJ can assess the [plaintiff's] residual functional capacity, a medical source statement or formal medical opinion is not necessarily required." *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (internal citations and quotation omitted).

Moreover, the ALJ's conclusion need not "perfectly correspond with any of the opinions of medical sources cited in [his] decision," because the ALJ is "entitled to weigh all of the evidence available to make an RFC finding that [i]s consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971) (the RFC need not correspond to any particular medical opinion; rather, the ALJ weighs and synthesizes all evidence available to render an RFC finding consistent with the record as a whole); *Castle v. Colvin*, No. 1:15-CV-00113 (MAT), 2017 WL 3939362, at *3 (W.D.N.Y. Sept. 8, 2017) (The fact that the ALJ's RFC assessment did not perfectly match a medical opinion is not grounds for remand.).

Furthermore, the burden to provide evidence to establish the RFC lies with Plaintiff—not the Commissioner. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a); *see also Talavera v. Astrue*, 697

F.3d 145, 151 (2d Cir. 2012) ("The applicant bears the burden of proof in the first four steps of the sequential inquiry . . . ."); *Mitchell v. Colvin*, No. 14-CV-303S, 2015 WL 3970996, at *4 (W.D.N.Y. June 30, 2015) ("It is, however, Plaintiff's burden to prove his RFC."); *Poupore v. Astrue*, 566 F.3d 303, 305-06 (2d Cir. 2009) (The burden is on Plaintiff to show that he cannot perform the RFC as found by the ALJ.).

Contrary to Plaintiff's contentions, the ALJ in this case properly analyzed and weighed the opinion evidence under the applicable regulations,[4] and substantial evidence supports the ALJ's finding that Plaintiff was capable of a reduced range of light work. Tr. 26-27.

Plaintiff first argues that the ALJ's decision was not supported by substantial evidence because the ALJ did not properly weigh the Medical Source Statement provided by treating orthopedist Dr. Clark. *See* ECF No. 9-1 at 15. However, the ALJ properly considered the regulatory factors and gave good reasons for assigning Dr. Clark's opinion little weight. As noted above, Dr. Clark completed a Medical Source Statement on March 29, 2016, in which she stated she had treated Plaintiff since May 2015 for lumbar disc displacement and radiculopathy. Tr. 706-09. Dr. Clark noted that Plaintiff experienced low back and right leg pain rated as an 8 out of 10. Tr. 706. Dr. Clark opined that Plaintiff was able to sit for ten minutes at one time, stand for 10 minutes at one time, and walk for ten minutes at one time. Tr. 707-08. Dr. Clark checked boxes to indicate that Plaintiff could sit for less than two hours in an eight-hour day and stand/walk for less than two hours in an eight-hour day. Tr. 706. She further opined that Plaintiff could rarely lift and carry less than 10 pounds, and could never twist, stoop, crouch, climb ladders, and climb stairs. Tr. 708. She concluded that Plaintiff would be off-task 25 percent or more of a typical workday due to his

---

[4] New regulations regarding the evaluation of medical evidence and rescission of Social Security Rulings 96-2p, 96-5p, 96-6p, and 06-03p took effect on March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (Jan. 18, 2017). Because Plaintiff's applications were filed on February 12, 2013, the previous regulations are applicable to his claims.

symptoms. Tr. 709. The ALJ considered Dr. Clark's opinion form and assigned it little weight because it was not supported by Dr. Clark's own treatment notes and was inconsistent with other evidence in the record. Tr. 33.

Plaintiff argues that Dr. Clark's opinion form is entitled to greater weight because Dr. Clark was Plaintiff's treating spine specialist. *See* ECF No. 9-1 at 17. However, the Commissioner's regulations provide that a treating source's opinion on the issues of the nature and severity of an individual's impairment is entitled to controlling weight only if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). When a treating source's opinion is not afforded controlling weight, factors, including length, nature and extent of a treatment relationship, relevant evidence to support an opinion and the consistency of the opinion with the record as a whole, the source's specialty, as well as any other factors are considered in determining what weight to afford the opinion. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

Good reasons for not assigning a treating source opinion controlling weight are shown through explicit consideration of these factors, although a "searching review of the record" can also demonstrate good reasons for the weight given to the opinion. *See Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019) (citing *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)). Thus, a treating source's opinion is not entitled to controlling weight when it is not consistent with the source's own treatment notes or with other substantial evidence. *See Halloran*, 362 F.2d at 31-32 (citing *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)); *Cichocki v. Astrue*, 729 F. App'x 71, 77 (2d Cir. 2013).

Here, the ALJ explained that the opinions contained in Dr. Clark's March 2016 Medical Source Statement were not supported by her treatment notes. Tr. 33. As the ALJ discussed, Plaintiff began treating with Dr. Clark for low back and right leg pain in May 2015. [5] Tr. 28. The ALJ also acknowledged that in October 2014, Plaintiff had consulted with another physician in Dr. Clark's practice, Dr. Bernas, for left shoulder pain. Tr. 28, 653-55, 658-60. However, as previously explained, Plaintiff did not begin treating with Ms. McNichol and Dr. Clark for lower back pain until May 2015. Tr. 635-39. In that initial visit, Ms. McNichol found a smooth and reciprocal gain, full range of motion of the lumbar spine, full strength of the lumbar spine, negative straight leg raising test, normal (2+) reflexes, and intact sensation at Plaintiff's initial evaluation. Tr. 28, 635-36. Ms. McNichol also found some tenderness along the right sacroiliac joint, but no tenderness to the midline of the spine or paraspinal muscles. Tr. 28, 636. The ALJ also noted that Plaintiff returned to Dr. Clark in June, August, September, and December 2015, and January 2016, and demonstrated lumbar spine tenderness and decreased range of motion, but full strength, intact sensation, smooth and reciprocal gait, normal (2+) pulses, and negative straight leg raising test. Tr. 28, 641, 644, 649, 677, 734.

The ALJ further discussed that Dr. Clark offered epidural steroid injections and surgical treatment, but Plaintiff continued with conservative treatment, consisting of chiropractic manipulations and pain medication. Tr. 28, 650, 661, 735. *See* 20 C.F.R. §§ 404.1569(c)(3)(iv)-(v), 416.929(c)(3)(v) (the ALJ considers the treatment, other than medication, a claimant receives for relief of her symptoms); *see also Penfield v. Colvin*, 563 F. App'x 839, 840 (2d Cir. 2013) (evidence of a conservative treatment regimen supported the ALJ's determination that plaintiff's symptoms were not as severe as she alleged); *Snyder v. Comm'r of Soc. Sec.*, 840 F. App'x 641,

---

[5] As previously noted, on May 12, 2015, Plaintiff was actually seen by Ms. McNichol, which appears to be Plaintiff's initial visit to the orthopedics practice that includes Dr. Clark and Dr. Bernas. Tr. 635-40.

643 (2d Cir. 2021) (conservative treatment may weigh against a disability finding) (internal citations omitted). In this case, the ALJ appropriately considered that Plaintiff declined epidural injections because of his clotting disorder and inability to receive injections while taking the blood thinner Coumadin. Tr. 28, 675. However, as the ALJ explained, surgical treatment could be performed with only a brief period of Plaintiff being switched to Lovenox in place of Coumadin, but there is no record that Plaintiff ever consented to undergo surgery. Tr. 28, 675, 735.

Based on the foregoing, the ALJ reasonably concluded that Dr. Clark's opinion of extreme limitations in most areas of physical functioning was not supported by her treatment notes and clinical findings, and therefore was not entitled to controlling weight. Tr. 33; *see* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *See Halloran*, 362 F.3d at 31 (ALJ demonstrates good reason for assigning a treating source opinion little weight where the assessment is not supported by the source's own treatment notes); *Woodmancy v. Colvin*, 577 F. App'x 72, 75 (2d Cir. 2014) (ALJ properly assigned little weight to treating physician's opinion when contradicted by unremarkable clinical findings).

The ALJ also concluded that Dr. Clark's opinion was not entitled to controlling weight because it was inconsistent with other evidence in the record. Tr. 33. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Specifically, the ALJ noted that Dr. Clark's opinion was inconsistent with Plaintiff's reported ability to independently perform a wide range of activities that included cooking, shopping, driving, and taking his dog for walks. Tr. 29, 31, 33, 390-93, 609, 614. The ALJ further noted that consultative examiner Dr. Liu assessed some reduced range of motion of the lumbar spine in July 2014, but normal gait, no tenderness of the lumbar spine, no muscle spasms or trigger points in the lumbar spine, negative straight leg raising test, intact sensation, full muscle strength, and no evidence of muscle atrophy. Tr. 27, 615. Moreover, Dr. Liu

observed that Plaintiff needed no help changing for the exam, getting on and off the exam table, and rising form a chair. Tr. 615. Dr. Liu opined that, on the basis of his examination findings, Plaintiff had only mild limitations bending, kneeling, overhead reaching, and walking for prolonged periods. Tr. 616.

Finally, subsequent treatment notes from Plaintiff's primary care providers indicated that Plaintiff continued to demonstrate full strength and normal gait. Tr. 753, 759, 764, 769, 777, 915-16, 926. Thus, the ALJ cited to substantial evidence in the record that contradicted Dr. Clark's opinion, and reasonably declined to assign her opinion controlling weight. Tr. 33. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Halloran*, 362 F.3d at 31 ("When other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling."); *Rusin v. Berryhill*, 726 F. App'x 837, 839 (2d Cir. 2018) (finding no error where ALJ declined to afford controlling weight to treating physician's opinion that was inconsistent with treatment notes, other medical opinion evidence, and reported activities).

As noted above, when a treating source's opinion is not afforded controlling weight, the ALJ considers other factors in determining how much weight to afford the opinion. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). Here, the ALJ also considered the remaining regulatory factors and provided good reasons for assigning Dr. Clark's opinion little weight. *See Estrella*, 925 F.3d at 95-96. For example, the ALJ noted that Dr. Clark was "an orthopedic specialist," and thereby considered her specialty. Tr. 28. *See* 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5). Additionally, the ALJ considered that Dr. Clark began treating Plaintiff in May 2015 and saw Plaintiff on an almost monthly basis through the date of her March 2016 opinion. Tr. 28. The ALJ thus considered the length, nature, and extent of the treatment relationship, and the frequency of

examination. *See* 20 C.F.R. § 404.1527(c)(2)(i)-(ii). Accordingly, the ALJ properly considered the regulatory factors in evaluating Dr. Clark's opinion. Tr. 28-33.

Plaintiff appears to suggest that the ALJ's failure to discuss the nature of the treatment relationship and Dr. Clark's medical specialty in the very same paragraph as his discussion of Dr. Clark's opinion warrants remand. However, the ALJ discussed Dr. Clark's treatment relationship, specialty, and clinical findings elsewhere in his decision, and the ALJ's rationale for assigning Dr. Clark's opinion little weight is evident from a reading of the ALJ's entire decision. *Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 112-13 (2d Cir. 2010) (The absence of an express rationale for an ALJ's conclusions does not prevent [the court] from upholding them so long as [the court is] able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence.").

Plaintiff also alleges that diagnostic studies, including an MRI and EMG, as well as Dr. Clark's "recommendation" that Plaintiff undergo surgery support Dr. Clark's opinion of disabling functional limitations. *See* ECF No. 9-1 at 17-18 (citing Tr. 646, 735). However, the ALJ expressly acknowledged that Dr. Clark reviewed an MRI study of the lumbar spine that showed disc bulging and herniation and an EMG that suggested right-sided L4 and L5 radiculopathy and reasonably concluded that, while these studies confirmed that Plaintiff was experiencing some lower back and right leg pain, Dr. Clark's clinical findings indicated that Plaintiff was not as functionally limited as Dr. Clark indicated in the March 2016 opinion form. Tr. 28, 30, 33.

Additionally, while Plaintiff asserts that Dr. Clark "recommended" surgery, (*see* ECF No. 9-1 at 17), the record indicates that Dr. Clark had a "lengthy discussion with [Plaintiff] regarding operative versus nonoperative management" and *offered* surgery as a treatment option. Tr. 736. As the ALJ correctly noted, there was no indication in the record that Plaintiff ultimately decided

to pursue surgery. Tr. 28. Thus, a careful reading of the ALJ's decision shows that the ALJ considered these factors but reasonably concluded that Dr. Clark's treatment notes and mild clinical findings did not support her opinion of extreme functional limitations.

Finally, Plaintiff incorrectly argues that the ALJ erred in relying on Plaintiff's daily activities to discredit Dr. Clark's opinion. *See* ECF No. 9-1 at 18. However, an ALJ may consider the nature of a claimant's daily activities in evaluating the consistency of allegations of disability with the record as a whole. *See* 20 C.F.R. § 404.1529(c)(3)(i); *see also Ewing v. Comm'r of Soc. Sec.*, No. 17-CV-68S, 2018 WL 6060484, at *5 (W.D.N.Y. Nov. 20, 2018) ("Indeed, the Commissioner's regulations expressly identify 'daily activities' as a factor the ALJ should consider in evaluating the intensity and persistence of a claimant's symptoms.") (citing 20 C.F.R. § 416.929(c)(3)(i)); *Rusin*, 726 F. App'x at 839 (finding no error where ALJ declined to afford controlling weight to treating physician's opinion that was inconsistent with treatment notes, other medical opinion evidence, and reported activities).

In this case, it was reasonable for the ALJ to conclude that Plaintiff's activities were inconsistent with Dr. Clark's opinion. As the ALJ noted, in Plaintiff's February 2014 function report (Tr. 390-93) and in his reports to Dr. Liu (Tr. 614) and Dr. Ippolito (Tr. 609), Plaintiff indicated that he was essentially independent with household chores, driving, shopping, etc. Tr. 30-31. The ALJ also specifically noted that Plaintiff reported walking his dog four to five times per day (Tr. 392), which directly contradicts Dr. Clark's opinion that Plaintiff could only walk for 10 minutes at a time and stand/walk for less than two hours total in an eight-hour workday (Tr. 706-08). Tr. 31. Similarly, Plaintiff's reports that he was able to drive a car undermined Dr. Clark's opinion that Plaintiff could only sit for 10 minutes at one time. Tr. 392. Plaintiff also testified that he sat in a car for a one-hour ride to his brother's cabin. Tr. 81. Thus, it was reasonable for the

ALJ to conclude that Plaintiff's reported activities were inconsistent with Dr. Clark's opinion. Tr. 33.

In any event, as noted above, the ALJ cited to other evidence in the record, including Dr. Clark's treatment notes and Dr. Liu's report, and did not rely exclusively on Plaintiff's reported activities to conclude that Dr. Clark's opinion was entitled to little weight. Tr. 33. In sum, the ALJ properly weighed Dr. Clark's opinion in accordance with the regulations, and Plaintiff has not introduced evidence showing that no reasonable factfinder could have concluded that Dr. Clark's opinion was entitled to little weight. *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (The Commissioner's findings of fact must be upheld unless "a reasonable factfinder would *have to conclude otherwise*.") (emphasis in original). Accordingly, the Court finds no error.

Plaintiff next argues that remand is warranted because the ALJ did not discuss the July 2014 opinion of consultative examiner Dr. Ippolito, who opined (among other things) that Plaintiff had moderate limitations in appropriately dealing with stress. *See* ECF No. 9-1 at 20-23. Plaintiff's argument is meritless. As demonstrated below, the ALJ discussed Dr. Ippolitto's opinion, identified and discussed Plaintiff's specific stressors, and crafted and RFC that restricted Plaintiff's exposure to potentially stressful situations. Thus, contrary to Plaintiff's argument, the ALJ properly accounted for Dr. Ippolito's opinion of difficulties dealing with stress in the RFC finding.

Dr. Ippolito opined that Plaintiff was able to follow and understand simple directions and instructions; perform simple tasks independently; maintain attention and concentration; maintain a regular schedule; make appropriate decisions; and relate adequately with others with no evidence of limitation; however, she also noted that Plaintiff exhibited moderate limitations dealing with stress. Tr. 610. The ALJ assigned Dr. Ippolito's opinion reduced weight because it was not entirely consistent with the record and specifically explained that the record showed that Plaintiff required some restrictions on his social interactions and ability to perform complex work. Tr. 32-33.

Plaintiff suggests that the ALJ's restrictions regarding social interactions and complex work were unrelated to his difficulties dealing with stress. *See* ECF No. 9-1 at 20. However, the ALJ explicitly stated that he was accounting for Plaintiff's difficulties dealing with stress by restricting Plaintiff's exposure to social interactions and complex work. Tr. 25. In fact, the ALJ specifically noted that Plaintiff "experienced some recurrent anxiety involving social interaction or leaving his home," citing as examples Plaintiff's testimony that he had panic attacks in social situations where there were big groups of people (Tr. 74-75); his reports of increased anxiety at parties, crowded gatherings, and work meetings (Tr. 399); and his complaints of increased anxiety when leaving his home (Tr. 621). Tr. 25.

However, the ALJ also noted that Plaintiff left his home several times per day to perform activities such as walking his dog, shopping, attending medical appointments, and attending occasional social events. Tr. 25, 392, 609, 629, 631. Therefore, the ALJ reasonably concluded that the record did not show that Plaintiff was unable to leave his home due to panic. Tr. 25, 31. The ALJ recognized, however, that "the more intense/frequent social interactions typical of many jobs might be too stressful for the claimant." Tr. 25. Accordingly, the ALJ accounted for Plaintiff's moderate difficulties dealing with stress by restricting Plaintiff to jobs that did not require teamwork and that only required superficial interaction with the public and occasional interaction with coworkers. Tr. 25-26, 31.

The ALJ also restricted Plaintiff to simple and routine work with no production rate or pace work in part to account for his difficulties dealing with stress. Tr. 26, 32. Specifically, the ALJ noted that Plaintiff demonstrated the ability to perform simple daily activities such as cooking, shopping, and walking his dog, but that "more complicated or stressful mental tasks [might] be[] difficult." Tr. 25, 31, 32. Because it is evident from the ALJ's decision that the ALJ properly

accounted for Plaintiff's moderate limitations dealing with stress, Plaintiff's argument that the ALJ failed to discuss how Plaintiff's moderate stress limitations were accounted for in the RFC is meritless.

As noted above, it is Plaintiff who bears the burden of proving that his RFC is more restricted than that found by the ALJ, whereas the Commissioner need only show that the ALJ's decision was supported by substantial evidence in the record. *See Poupore*, 566 F.3d at 306 (Plaintiff bears the burden of proof at steps one through four of the sequential analysis); *Smith v. Berryhill*, 740 F. App'x 721, 726 (2d Cir. 2018) ("Smith had a duty to prove a more restrictive RFC and failed to do so."). Plaintiff here has not introduced any evidence showing that he cannot perform the RFC due to moderate difficulties dealing with stress. Accordingly, the Court finds no error.

In his third and final point of error, Plaintiff argues that the ALJ's RFC finding is not supported by substantial evidence because it was more restrictive than the opinions provided by the consultative examiners, but less restrictive than the opinions provided by the treating sources. See ECF No. 9-1 at 23-27. As such, argues Plaintiff, the ALJ impermissibly relied on his own lay opinion in assessing Plaintiff's RFC. *See id*. Contrary to Plaintiff's argument, however, the ALJ was not required to rely on an opinion that mirrored the RFC. Plaintiff's argument wrongly presumes that RFCs are medical determinations, and thus, outside the ALJ's expertise, but as explained above, RFC is an administrative finding, not a medical one. Ultimately, an ALJ is tasked with weighing the evidence in the record and reaching an RFC finding based on the record as a whole. *See Tricarico v. Colvin*, 681 F. App'x 98, 101 (2d Cir. 2017) (citing *Matta*, 508 F. App'x at 56). The regulations explicitly state that the issue of RFC is "reserved to the Commissioner"

because it is an "administrative finding that [is] dispositive of the case." 20 C.F.R. §§ 404.1527(d), 416.927(d).

Plaintiff also asserts that ALJs cannot interpret "raw" medical findings without the assistance of a medical source. *See* ECF No. 9-1 at 24-25. Contrary to Plaintiff's assertion, the regulations direct the ALJ to assess the RFC "based on all the relevant evidence in your case record," including "medical evidence." 20 C.F.R. §§ 404.1545(a), 416.945(a); *see also* SSR 96-8p, 1996 WL 374184 at *5 (explicitly stating that the medical evidence an ALJ must consider in assessing the RFC includes "medical signs and laboratory findings."). Moreover, the regulations direct the ALJ to weigh a medical source opinion by evaluating the extent to which the source of the opinion has presented evidence, "particularly medical signs and laboratory findings," to support the opinion. 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). Thus, the regulations not only allow an ALJ to consider raw medical findings, but even expect the ALJ to do so.

Furthermore, where, "the record contains sufficient evidence from which an ALJ can assess the [plaintiff's] residual functional capacity, a medical source statement or formal medical opinion is not necessarily required." *Monroe*, 676 F. App'x at 8 (internal quotations and citation omitted); *see Matta*, 508 F. App'x at 56 ("Although the ALJ's conclusions may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole."); *see also Wilson v. Colvin*, No. 6:16-cv-06509-MAT, 2017 WL 2821560, at *5 (W.D.N.Y. June 30, 2017) ("[T]he fact that an RFC assessment does not correspond exactly to a medical expert's opinion in the record does not mean that the RFC assessment is 'just made up'"). Thus, when considering the medical evidence and record to formulate the RFC, an ALJ does not draw his own conclusions or base the RFC determination on his own lay opinion; instead, the ALJ considers "the

medical and other relevant evidence in the record in its totality to reach an RFC determination." *Curry v. Comm'r Soc. Sec.*, No. 20-1472, 2021 WL 1942331, *2 n.3 (2d Cir. May 14, 2021).

Plaintiff further argues that the ALJ's finding that Plaintiff would be off task for 5% of the workday was "too specific" and contends that the ALJ could not have reached such a specific finding without relying on a medical opinion. *See* ECF No. 9-1 at 28 (citing *Cosnyka v. Colvin*, 576 Fed. App'x 43, 46 (2d Cir. 2014)). However, "[t]he fact that the ALJ assigned a particular percentage range . . . to illustrate [Plaintiff's] limitation does not undermine the fact that the ALJ's finding was supported by substantial evidence." *Johnson v. Colvin*, 669 F. App'x 44, 47 (2d Cir. 2016). Unlike *Cosnyka*, where nothing in the record supported the ALJ's conclusion and indeed some evidence was "to the contrary," the ALJ in this case noted that therapy notes from 2015 revealed grossly intact attention and concentration during therapy sessions. Tr. 25, 31, 621, 623, 625, 627, 629, 631. The ALJ also noted that Plaintiff denied having difficulty with concentration (Tr. 629, 631), and he was able to perform simple tasks on a routine and ongoing basis (Tr. 390-93, 609, 614). Tr. 25. Finally, the ALJ cited Dr. Ippolito's opinion that Plaintiff would have no limitations maintaining attention and concentration. Tr. 29, 610. The ALJ explained that, based on this evidence, he expected Plaintiff to be off task for up to 5% of the workday due to combined symptoms but found that Plaintiff could generally "maintain focus and routine." Tr. 32. Thus, the ALJ sufficiently explained his finding, and substantial evidence in the record supports the ALJ's finding that Plaintiff would be off task no more than 5% of the workday. *See Johnson*, 669 F. App'x at 47 (highly specific RFC findings are not problematic when supported by substantial evidence in the record).

Plaintiff further argues that the ALJ's finding that Plaintiff would need to sit for ten minutes after thirty minutes of standing or walking, and would need to stand, walk, or stretch for up to one

minute after thirty minutes of sitting, was unsupported by the record. *See* ECF No. 9-1 at 28-29. However, the ALJ explained that the mostly normal clinical findings, including no evidence of muscle atrophy (Tr. 635-36, 641, 644, 649, 677, 734) and Plaintiff's ability to perform activities such as shopping, driving, and walking his dog (Tr. 390-93, 609, 614) undermined Plaintiff's testimony that he was only able to stand, walk, or sit for approximately five to 10 minutes at one time (Tr. 80) and his statement that he could only walk one half block and needed to change positions between sitting or standing every five minutes (Tr. 613). Tr. 29-30, 32. However, the ALJ also explained that he "extended some benefit of the doubt" and included this restriction to account for Plaintiff's complaints of discomfort with prolonged walking, standing, and sitting. Tr. 32, 394-95. Thus, the ALJ sufficiently explained his findings with specific citations to the record. *See Quinn v. Colvin*, 199 F. Supp. 3d 692, 713 (W.D.N.Y. 2016) (a limitation to sit and stand at half-hour intervals was sufficiently supported despite it not tracking any medical source opinion, because the record including varying opinions and testimony regarding how long the plaintiff could sit and stand); *Kirkland v. Colvin*, 15-cv-6002, 2016 WL 850909, *12 (W.D.N.Y. Mar. 4, 2016) (finding that the ALJ did not err by assessing specific limitations that did not precisely correspond to any medical opinion because the plaintiff's daily activities, treatment history, and consultative examiner's evaluation supported those limitations). Because substantial evidence in the record supports the ALJ's findings with respect to the 5% off-task limitation and the sit/stand/walk limitation in the RFC, the Court finds no error.

As detailed above, substantial evidence in the record supports the ALJ's RFC finding. When "there is substantial evidence to support either position, the determination is one to be made by the fact-finder." *Davila-Marrero v. Apfel*, 4 F. App'x 45, 46 (2d Cir. Feb. 15, 2001) (citing *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990)). While Plaintiff may disagree with the ALJ's

conclusion, Plaintiff's burden was to show that no reasonable mind could have agreed with the ALJ's conclusions, which he has failed to do. The substantial evidence standard is "a very deferential standard of review – even more so than the 'clearly erroneous' standard," and the Commissioner's findings of fact must be upheld unless "a reasonable factfinder would *have to conclude* otherwise." *Brault*, 683 F.3d at 448 (emphasis in the original). As the Supreme Court explained in *Biestek v. Berryhill*, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high" and means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

For all the reasons discussed above, the Court finds that the ALJ properly considered the evidence of record, including the medical opinion evidence, the treatment notes, and the objective findings, and the ALJ's findings are supported by substantial evidence. Accordingly, the Court finds no error.

## CONCLUSION

Plaintiff's Motion for Judgment on the Pleadings (ECF No. 9) is **DENIED**, and the Commissioner's Motion for Judgment on the Pleadings (ECF No. 10) is **GRANTED**. Plaintiff's Complaint (ECF No. 1) is **DISMISSED WITH PREJUDICE**. The Clerk of Court will enter judgment and close this case.

**IT IS SO ORDERED**.

DON D. BUSH
UNITED STATES MAGISTRATE JUDGE